2021 IL App (1st) 161797-U

FOURTH DIVISION
November 12, 2021

No. 1-16-1797

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Respondent-Appellee, | ) ) | |
| v. | ) ) ) | No. 01 CR 17104 |
| LEON TANNA, | ) ) | |
| Petitioner-Appellant. | ) ) ) | |
| | ) ) ) | Honorable Allen F. Murphy, Judge Presiding. |

_____

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices Lampkin and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Affirming the judgment of the circuit court of Cook County dismissing defendant's second-stage postconviction petition where he did not make a substantial showing of a due process *Brady* violation to warrant a third-stage evidentiary hearing.

¶ 2    Defendant Leon Tanna appeals from the circuit court of Cook County's second-stage dismissal of his petition for relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)).  On appeal, defendant contends that the circuit court erred in

dismissing his postconviction petition as he made a substantial showing of a constitutional violation where the State failed to produce certain physical evidence as required under *Brady v. Maryland*, 373 U.S. 83 (1963). For the following reasons, we affirm the dismissal of defendant's postconviction petition.

¶ 3                                      BACKGROUND

¶ 4      Defendant was arrested and charged by indictment with eight counts of first-degree murder. At the jury trial, Elmer Conway (Conway) testified on behalf of the State that on the evening of April 11, 2001, he was in Patricia Hurd's (Hurd)[1] apartment on 11th Street in Ford Heights with Reggie and Jerome Anderson (Reggie and Jerome), Michael Cunnigan (Michael), Mark Fulwiley (Fulwiley), Dwight Vance (Vance), Hurd, and defendant. Conway testified that while defendant was eating a polish sausage, Vance asked him if he could have a piece of it. Defendant responded that Vance should get his own polish sausage from the kitchen. Vance went to the kitchen and when he returned with a polish sausage, he told defendant that if the sausage did not taste good he would "kick [defendant] in his face." Vance then took a bite of the sausage and immediately kicked defendant in the face. The two started wrestling and fell through a glass table in the living room. The others broke up the fight, and Hurd asked everyone to leave the apartment so that she could clean up the mess.

¶ 5      Conway testified that he stayed behind to help Hurd clean the glass from the floor, and that everyone else went outside. A few minutes later Reggie and Jerome, Michael, and Fulwiley walked back into the apartment. Defendant followed behind, and told everyone that he was going to the Chicago Heights police station to pick up his friend Dana Cunnigan (Dana). After defendant left, Vance came back into the apartment and asked to use the telephone. He sat in a

---

[1] Patricia Hurd's name is also spelled "Heard" in the record.

chair in the middle of the living room with his back to the front door and picked up the receiver.

¶ 6     Conway stated that he was still cleaning glass from the floor, about 10 feet away from Vance, when he heard gunshots from inside the house. He turned around and observed Vance lying face down on the floor, with the telephone receiver still in his hand, while defendant was shooting him in the back. Conway also testified that he did not see anything other than the telephone in Vance's hands, and that, to his knowledge, no one else in the apartment that night had a firearm.

¶ 7     On cross-examination, Conway acknowledged that he was a good friend of Vance and that both of them were members of the same street gang. After defense counsel attempted to elicit information regarding the "street names" of all the individuals present in Hurd's apartment, Conway explained that his street gang was an organization that was "like a gang," but that they did not sell drugs. Conway further admitted that all the men in the apartment, including defendant, were members of the same "organization," but that he did not know defendant.

¶ 8     Conway also acknowledged on cross-examination that defendant never provoked Vance to hit him in the face. Conway also stated that he was not facing the door when defendant returned and therefore could not say what position Vance was in with regard to defendant.

¶ 9     Mark Fulwiley testified that on April 11, 2001, he was in the living room of Hurd's apartment with Conway, Reggie, Jerome, Vance, Hurd, and defendant. He testified that defendant was speaking on the telephone with Dana, and eating a polish sausage, when Vance interrupted him to ask for a piece. After defendant refused to share the sausage, Vance told defendant, "if you were one of my guys, you would give me a bite." The two then argued until Hurd mentioned that there was another polish sausage in the kitchen. Vance then went to the kitchen to get the polish sausage, but when he returned, he told defendant that he was going to

kick him if the polish sausage "was good."[2] Vance then tasted his sausage and kicked defendant in the face. The two wrestled and fell through a glass table, until the others broke up the fight, and Hurd told everyone to leave.

¶ 10    Fulwiley next testified that once all of them were outside, Vance and defendant continued to argue for a minute, but then shook hands and agreed to stop fighting. Upon going back inside, defendant quickly used the telephone, then told everyone that he needed to "bond Dana Cunnigan out of jail," and asked for the keys to an automobile that apparently everyone in the apartment used. After defendant left, Fulwiley sat on the couch, and Vance picked up the receiver to use the telephone.

¶ 11    According to Fulwiley, about 15 to 20 minutes later, defendant returned to the apartment with a firearm in his hand. Fulwiley stated that when defendant entered the apartment, the firearm was "so close that if [defendant] extended his arm out, the gun would be to [Vance's] head." He also testified that Vance's back was turned toward the front door, and that defendant said nothing that would alert Vance to his presence.

¶ 12    Fulwiley testified that defendant then pulled the trigger and shot Vance in the head. As Vance fell out of his chair, Fulwiley put a pillow over his own face because he thought defendant "was fixing to kill everybody in the house." Although he could not see what was happening, Fulwiley stated that he heard about 13 to 14 more shots. When the shooting subsided, he looked up and observed defendant standing over Vance with the back of his weapon "stuck back." Defendant put another clip into his firearm, and said "I'll holler at y'all, G," and walked out.

---

[2] The witnesses had different accounts as to what exactly was said by Vance regarding the polish sausage. Fulwiley testified that Vance stated he would kick defendant in the head if the polish "was good" while Conway testified that Vance stated he would kick defendant in the face if it was not good.

¶ 13    Fulwiley testified that Vance was a good friend, whereas he knew defendant only from the neighborhood.  He also stated that to his knowledge, aside from defendant, no one in the apartment that evening had a firearm.

¶ 14    On cross-examination Fulwiley acknowledged that Vance initially started the argument over the polish sausage.  He further explained that when Vance threatened to kick defendant in the face, he believed Vance was joking and did not think he posed any danger to defendant.  However, once he observed Vance kick defendant in the face, Fulwiley realized that "Vance was serious."  Fulwiley finally stated that after defendant left after shooting Vance, everyone remained in the apartment for five to 10 minutes, and that he then called the police.

¶ 15    On redirect examination, Fulwiley acknowledged that he and defendant were members of the same street gang.  On recross-examination, he then acknowledged that Vance was a member of the same street gang, and admitted he had lied on cross-examination when he stated he did not know whether Vance was a member, as he thought that this information might hurt the State's case.

¶ 16    Next, Reggie Anderson testified to essentially the same sequence of events.  He added that during the initial scuffle, Vance "slammed defendant through a table."  He also stated that when defendant returned to the apartment, Vance had been sitting with his back toward the door, facing the window, and talking on the telephone, and that defendant began to shoot even before stepping through the front door.  According to Reggie, after defendant shot Vance in the head, Vance fell "right on [Reggie's] lap."  Defendant continued to shoot, then stopped, took his clip out, put another one in, and walked off saying "G.D.," which in street terms is the name of his street gang.

¶ 17    On cross-examination, defense counsel used Reggie's reference to the street gang to elicit

testimony that everyone in the apartment that night except for Hurd was a gang member. Reggie also acknowledged that his brother Jerome owned a .357-caliber revolver, but that he did not believe his brother had the weapon on him on the night of the shooting.[3]

¶ 18    Crime scene investigator Frank Laserko (Laserko) of the Cook County Sheriff's Police Department, testified that in the early morning of April 12, 2001, he responded to a homicide investigation at the 1200 block of East 11th Street in Ford Heights. Once there, Laserko photographed and searched the crime scene, which consisted of the living room of the residence. He testified that he discovered a total of 12 shell casings, 11 of which were found in an area about 5'5" square from the northeast corner of the living room, and the remaining one underneath the victim's body. Laserko testified that all the shell casings came from a 9-millimeter Luger CVC.

¶ 19    Laserko further testified that he did not recover a weapon from the crime scene, but that officers from the Ford Heights Police Department retrieved a Smith and Wesson .357-caliber revolver hidden in the bushes near the south side of the residence. This revolver contained three live bullets, and no spent shell casings. Laserko testified that upon examining this weapon it was evident to him that the weapon had not been recently fired and that it was not the 9-millimeter automatic used in the shooting.

¶ 20    On cross-examination, Laserko testified that the .357-caliber revolver was discovered "hidden behind some bushes" outside of Hurd's apartment building and that he determined it was not relevant to the offense and therefore he did not request it be forwarded to the crime lab for analysis. Laserko acknowledged that he did not fingerprint or inventory the .357-caliber revolver, but returned it to the Ford Heights Police Department. Laserko also admitted that he

---

[3] Reggie's brother Jerome died prior to this case going to trial.

had not spoken to any witnesses prior to making the determination that the .357-caliber revolver had not been used in the offense. Laserko further admitted that he did not know whether or not the .357-caliber revolver had been at the crime scene.

¶ 21    Assistant Cook County medical examiner Joseph Lawrence Cogan (Dr. Cogan) next testified that on April 13, 2001, he performed the autopsy of Vance. Dr. Cogan testified that the body contained two gunshot wounds to the head and multiple gunshot wounds to the back and left shoulder. All the wounds were entrance wounds, which had a pattern of traveling from left to right and from the back forward, in similar directions. Based on this evidence, Dr. Cogan testified that in his expert opinion, Vance died as a result of multiple gunshot wounds, and that the manner of death was homicide.

¶ 22    On cross-examination, Dr. Cogan acknowledged that he tested the victim's body for gun powder residue, which if found, would indicate that the victim was shot at a range of 18 inches or less, but that no gun powder residue was found on the body.

¶ 23    Cook County Sheriff's Sergeant Matt Rafferty (Sergeant Rafferty) testified that as part of his investigation of the murder that occurred in Ford Heights on April 11, 2001, he conducted interviews, and took statements from witnesses. Based on those statements he unsuccessfully attempted to locate defendant and accordingly obtained an arrest warrant for defendant's arrest.

¶ 24    On June 26, 2001, Sergeant Rafferty was notified that defendant was in the custody of the Chicago Police Department on this warrant. Sergeant Rafferty met with and interviewed defendant at Area 4 headquarters. Following the interview, defendant was transported to an office of the Cook County Sheriff's Department in the Markham courthouse, where he was interviewed by Assistant State's Attorney Maureen Delahantey (ASA Delahantey).

¶ 25    On cross-examination, Sergeant Rafferty acknowledged that during his investigation, he

discovered that the victim was shot with a 9-millimeter firearm, but that a .357-caliber revolver was discovered near the crime scene. He further stated that as part of his investigation, he discovered that the revolver belonged to Jerome. The court then allowed Sergeant Rafferty to testify that he had a conversation with Jerome on April 17, 2001, and that Jerome had identified a photograph of the .357-caliber revolver and told the sergeant that the weapon belonged to him. Sergeant Rafferty also testified that a jacket and keys were recovered from the crime scene.

¶ 26 ASA Delahantey testified that on June 27, 2001, at 2:45 a.m. she interviewed defendant in the hallway of the Markham courthouse, in the presence of Sergeant Rafferty. ASA Delahantey further testified that she asked defendant if he wanted to memorialize his statement by way of a videotaped statement. Defendant agreed and signed a consent form. That video was entered into evidence and published to the jury without objection.

¶ 27 According to defendant's videotaped statement, at about 2:30 p.m. on April 11, 2001, he was in front of Hurd's apartment on the 1200 block of East 11th Street in Ford Heights, "shooting dice" with Michael, Dana, Jerome, Reggie, Vance, and Fulwiley. Soon thereafter, Dana was arrested by police for swearing at them, and everyone else went inside Hurd's apartment.

¶ 28 Defendant further stated that he was eating polish sausages and talking to Dana, who had called from the Chicago Heights police station, when Vance asked him for a piece of sausage. Defendant responded: "I ain't giving no grown n*** s***," and Vance replied with "I will take your mother f*** food." Defendant answered "Whatever" and told Dana on the telephone that there was no problem and that "somebody [was] just talking crazy."

¶ 29 Hurd then told Vance to leave defendant alone because he was not bothering anybody and to get another polish sausage from the kitchen. When Vance returned from the kitchen with

a sausage, he told defendant "I'll stab your a*** in your neck with this mother f*** fork."

Defendant stated that because he started laughing, Vance walked up to him and told him "I take a

bite of this polish and it's nasty. I'm gonna kick you're a*** and your face." Defendant did not

think Vance was serious and laughed again. However, after taking a bite of his sausage, Vance

kicked defendant in the face.

¶ 30     Defendant stated he then grabbed Vance and slammed him on Hurd's glass table,

shattering the glass. The others broke up the fight and everyone went outside to "cool off."

Defendant admitted that he had "cool[ed] off," because he knew Vance was drunk, but explained

that Vance continued to swear at him. Accordingly, the two argued as they returned to the

apartment, until the others told them to stop. At that point, defendant said "Man, that's him man.

I ain't saying nothing to him," and as a response, Vance turned around and hit him in the jaw.

Defendant again grabbed Vance and slammed him on the floor before the others broke up the

fight.

¶ 31     According to defendant, Vance then shouted at him, "I'm fitting to kill your mother f***

a***," and reached for the firearm in Jerome's pocket. However, Jerome pushed Vance away,

refused to give him the firearm, and told him to stop.

¶ 32     Defendant next stated that he asked Jerome for the car keys to bail Dana out of jail and

then left the apartment. However, he reached only as far as the corner of the apartment building

before deciding to return. Defendant explained he returned because he "was scared, feared for

his life 'cause [Vance] had threatened to kill [him]."

¶ 33     According to defendant, upon returning to the apartment, he observed Vance sitting

sideways to the door, and talking on the telephone. Defendant stated that he shot Vance twice in

the head, and that after Vance fell on the floor, he continued to shoot at him until his firearm was

empty. Defendant admitted that he believed he shot Vance 11 more times because he knew that his loaded 9-millimeter handgun had 13 bullets. After leaving the apartment, defendant explained that he disposed of the weapon in a cornfield, and took off his clothes because he was hot. He then walked in his underwear to Chicago Heights where his girlfriend lived, and from there went to his grandmother's house.

¶ 34    Defendant concluded his videotaped statement by explaining that he was giving the statement freely, and that he had been treated "all right" by police. After presenting defendant's videotaped statement, the State rested, and defense counsel made a motion for a directed verdict which was denied by the court.

¶ 35    Defendant was the only witness to testify in his case. He essentially testified to the same sequence of events that he had described in his videotaped confession but added that when he initially refused to give Vance a piece of his polish sausage, Vance exclaimed, "y'all treat him like he was a king or something *** We will murk you out there." Defendant explained that in street terminology "murk" means kill.

¶ 36    Defendant also added that during the fight, Vance repeatedly struck him in the face, and then said to Jerome "Give me the mother f*** gun. I'm fixing to kill this mother f***," as he reached into Jerome's pocket for the .357-caliber revolver. At trial, defendant identified the .357-caliber revolver from a photograph presented to him by defense counsel as the weapon which Vance reached for from Jerome's pocket. This photograph was admitted into evidence and published to the jury. Defendant also testified that during his initial interview with ASA Delahantey he noticed the actual .357-caliber revolver was wrapped in plastic at the State's Attorney's Office.

¶ 37    Defendant further testified that after the fight, he left the apartment to bail Dana out of

jail, but quickly remembered he had forgotten his keys and black jacket. Accordingly, he returned to the apartment and drew attention to himself by knocking at the front door. Defendant stated that someone let him in. As he walked through the door, defendant observed his coat on the couch next to Vance and realized he would have to walk past Vance to obtain it. Defendant then heard Vance telling someone on the telephone that he was waiting for defendant to return so that he could kill him, and noticed that Vance was holding Jerome's firearm in his hand.

¶ 38    After he heard Vance tell the person on the telephone "F*** that n***," defendant stated that he just began shooting as he was "in fear for his life." Defendant explained that he was scared because Vance had already hit him in the face, had threatened him, and had tried to reach for Jerome's weapon during their last scuffle. Defendant also testified that when he gave his videotaped statement, he did not provide the full version of these events as he was under stress.

¶ 39    On cross-examination, defendant admitted that he brought a fully loaded 9-millimeter handgun to Hurd's apartment and that he always carried the weapon with him. Defendant also admitted that when he re-entered the apartment, he already had the safety switch in the off position, and a live round in the chamber of the weapon. He claimed, however, that as he shot defendant, the weapon was just "going off" and he did not realize it would react that way. When asked whether Vance ever raised his weapon toward him, defendant responded, "With all due respect, I didn't give him a chance to." Defendant further explained that if he had given Vance a chance, Vance would have shot at him first. After defendant's testimony, the defense rested.

¶ 40    In rebuttal, the State called Sergeant Rafferty. The sergeant testified that during his initial interview with defendant at Area 4 headquarters, defendant told him that in his second fight with Vance, he ducked and avoided Vance's punch. Sergeant Rafferty also testified that defendant informed him that he only heard that Jerome had a firearm, but that he never actually

noticed one. The State also called ASA Delahantey who testified that when she originally interviewed defendant, she never showed him a photograph of the .357-caliber revolver that he identified at trial.

¶ 41    Before proceeding with the jury instructions conference, the trial court asked defendant if his trial counsel had discussed tendering jury instructions regarding second-degree murder with him, and defendant responded in the affirmative. The trial court additionally asked defendant if he was requesting that the jury be tendered those verdicts and instructions, and again he responded affirmatively.

¶ 42    The trial court then read each of the jury instructions into the record. Defense counsel specifically requested jury instructions defining the burden of proof for first-degree murder and second-degree murder based on the unreasonable belief in self-defense but did not request a jury instruction based on provocation engendered by mutual combat.

¶ 43    Following the instructions conference, both parties presented closing arguments. The State argued that defendant returned to the apartment to execute Vance. Defense counsel argued that defendant acted in self-defense, or alternatively unreasonably believed he was acting in self-defense. Defense counsel argued that this case was about a violent "lifestyle," and that in such an environment defendant was justified in believing that Vance presented a real threat to his life when he observed Vance with Jerome's firearm and heard him telling someone on the telephone that the next time he saw defendant he would kill him. Moreover, defense counsel argued that defendant's fear was warranted as earlier that day, Vance had already made good on his promise to kick defendant in the face if his polish sausage tasted bad.

¶ 44    Defense counsel also stated in his closing argument that the State and police purposely failed to fingerprint Jerome's .357-caliber revolver and introduce it into evidence, suggesting that

the revolver may have had Vance's fingerprints on it. He specifically argued, "Why not take [the weapon] and fingerprint it? Leon said Dwight had a gun in his hand. *** How much time does that take? We are trying to find the truth here. Why not take that gun, have it fingerprinted, analyze it, see if Dwight['s] fingerprints were on the gun?" Defense counsel further argued that the State failed to introduce defendant's jacket and keys, which were at the scene of the crime, and which would have corroborated defendant's testimony that he returned to the apartment to get them.

¶ 45    Defense counsel further attempted to discredit the testimony of the three eyewitnesses by pointing to their gang membership and close affiliation with the victim. He stated, "The State tells you that [its] witnesses *** were brutally honest. Naw. Not until they were cross-examined and had to become more honest." Defense counsel further argued that the only truth that came from the State's witnesses was Fulwiley's testimony that he lied on the stand when he initially stated that the victim was not a gang member as he believed "it would look bad."

¶ 46    In its rebuttal argument, the State argued, in reference to the fact that Jerome's weapon and defendant's jacket were not introduced into evidence, that "[t]he defense has no burden whatsoever. They have no burden whatsoever to put on evidence. But once they do, you get to consider that. Not only what they do put on, but what they don't put on." Defense counsel objected, and the court promptly sustained the objection and asked the State to move on.

¶ 47    The jury was instructed on the elements of first-degree murder, self-defense, and second-degree murder based on the unreasonable belief in self-defense. During deliberations, the jury sent a note to the court asking for the production of defendant's jacket and keys, to which the court, without objection from either party, responded with a note informing the jury that they have seen and heard the evidence and to keep deliberating. The jury subsequently returned a

verdict of guilty of first-degree murder.

¶ 48    Defendant filed a posttrial motion for a new trial and an amended motion for a new trial, which were both denied.  Following a sentencing hearing, defendant was sentenced to 22 years' imprisonment for first-degree murder and an additional 25 years because the jury found that he personally discharged the firearm that caused the death of the victim.

¶ 49    Defendant appealed claiming that his defense counsels were ineffective when they: (1) failed to request a second-degree murder instruction based upon provocation engendered by mutual combat or provocation engendered by substantial physical injury or assault; (2) elicited testimony from State's witnesses concerning gang evidence which opened the door for the State to introduce evidence of defendant's gang affiliation; (3) failed to question potential jurors; and (4) emphasized gang evidence during closing arguments.  Defendant further claimed that his right to a fair trial was denied when the State made improper arguments in rebuttal closing argument.  We found the State's rebuttal argument to constitute error but declined to find it was subject to the plain-error rule because the evidence against defendant was not closely balanced. Defendant's conviction was otherwise affirmed.  *People v. Tanna*, 1-04-3569 (Oct. 27, 2006) (unpublished order under Illinois Supreme Court Rule 23).

¶ 50    On March 31, 2007, defendant filed a *pro se* petition for relief under the Act arguing (1) the State violated his due process rights by not providing trial counsel with defendant's jacket, keys, and the .357-caliber revolver, (2) his due process rights were violated when Laserko failed to collect the .357-caliber revolver and send it to the lab for fingerprinting, (3) trial counsel was ineffective for proceeding to trial without the State's complete compliance with discovery, (4) trial counsel was ineffective for failing to notify the trial court that the State failed to comply with Illinois discovery rules, (5) trial counsel failed to file a motion to dismiss based on the

State's failure to comply with discovery rules, (6) trial counsel failed to call certain witnesses to testify, (7) his due process rights were violated by the trial court's failure to answer the jury's question during deliberations, and (8) appellate counsel was ineffective for failing to raise the above claims on direct appeal. On May 21, 2007, the circuit court dismissed defendant's postconviction petition without prejudice because the mandate had been recalled and the matter was presently on appeal.

¶ 51 On December 5, 2007, defendant filed a *pro se* "Petition for Leave to Refile Post-Conviction." On January 18, 2008, the circuit court appointed postconviction counsel and docketed the petition.

¶ 52 After engaging in years of discovery regarding the .357-caliber revolver, jacket, and keys, the physical evidence was discovered to be in the possession of the Cook County Sheriff's Police Department in August 2014. Postconviction counsel then filed a supplemental postconviction petition and Rule 651(c) certificate on June 5, 2015. The three claims now raised were that (1) the State violated defendant's due process rights where it failed to tender exculpatory evidence that was specifically requested by defense counsel as required under *Brady*, (2) the firearm enhancement violated the proportionate penalties clause, and (3) direct appeal counsel was ineffective for failing to argue that the firearm enhancement was improper double enhancement.

¶ 53 In support of his petition, defendant included the affidavits of trial counsel and an investigator from the public defender's office. Trial counsel averred that prior to trial she asked the State's attorney for the "coat/sweater" and keys which were discovered in the apartment and was informed that neither the Cook County Sheriff nor the Ford Heights Police Department had the missing items. Trial counsel further averred that she informed the State's attorney that the evidence was "crucial" to defendant's defense and the State offered to participate in a Rule 402

conference with the understanding that it would not request firearm enhancement. Trial counsel's affidavit did not address a request for the .357-caliber revolver. The second affidavit from the investigator attested that on August 25, 2014, she went to the Cook County Sheriff's Police Department office where the .357-caliber revolver and defendant's jacket and keys were produced. She then took photographs of these items.

¶ 54 The State moved to dismiss defendant's petition arguing that no *Brady* violation occurred as defense counsel was aware of the recovery of defendant's clothing and keys inside the apartment as well as the .357-caliber revolver which was found outside of the building and that these items were not hidden from defense counsel. The State argued, regardless of the defendant's motivation for returning to the building, these items were not material as the evidence established he entered the apartment with a loaded 9-millimeter firearm and immediately shot Vance 13 times. In addition, the State asserted that any inquiry into the jury's question regarding the whereabouts of the jacket and keys was merely speculative.

¶ 55 In response, defendant argued his due process rights were violated when the State suppressed the .357-caliber revolver as well as his jacket and keys. Defendant maintained that defense counsel specifically requested these items and did not receive them even though they were in possession of the Cook County Sheriff's Police Department. Defendant asserted that this physical evidence was material to his case as it supported his theory of defense: that he returned to Hurd's apartment to obtain his jacket and keys and did not fire his weapon until he observed Vance point the .357-caliber revolver at him. Defendant also argued that Jon Flaskamp (Flaskamp), a forensic scientist employed by the Illinois State Police, averred in an affidavit that a .38 caliber bullet was discovered at the crime scene and that that bullet was fired from a weapon other than defendant's 9-millimeter. Indeed, this bullet could have been fired from a

.357-caliber revolver.

¶ 56    Attached to the response was the affidavit from Flaskamp, an expert in firearm and toolmark identification, in which he averred that he examined the cartridge cases and bullets recovered at the scene and determined that a .38 caliber bullet which had been recovered was fired from a different firearm than the "other 9mm/.38 caliber bullets" received in this case. Flaskamp opined that this bullet could have been fired from a .357-caliber revolver.

¶ 57    After hearing argument from the parties, the circuit court dismissed the petition. In doing so, the circuit court stated the jacket, keys, and firearm were never hidden from defendant or defense counsel: "Everybody knew it was out there, and it was brought out through various witnesses during the trial that these objects, if you will, existed." The trial court observed that Laserko testified the .357-caliber revolver was recovered outside the apartment and that the Ford Heights police department inventoried the firearm. The trial court further observed that Sergeant Rafferty testified that a coat and keys were recovered from the crime scene. The trial court also noted the fact that the physical evidence was not actually present did not constitute a substantial constitutional deprivation.

¶ 58    Thereafter, defendant filed a motion to reconsider, which the circuit court denied. This appeal followed.

¶ 59                                    ANALYSIS

¶ 60    On appeal, defendant contends that he made a substantial showing that the State committed a discovery violation under *Brady* by failing to produce the .357-caliber revolver that was found outside the apartment where the shooting occurred, along with defendant's jacket and keys. Defendant maintains that the State withheld these items despite trial counsel's request for them and that each of these items supported his defense and would have impeached the State's

witnesses. In addition, had the State produced the revolver, defendant could have subjected it to forensic testing, which could have potentially impeached the State's witnesses who testified that Vance did not have a firearm at the time of the shooting. Defendant requests that this court reverse the circuit court's dismissal of his petition and remand the matter for a third-stage evidentiary hearing under the Act.

¶ 61                                    Principles of the Act

¶ 62    We begin with a discussion of the familiar principles of the Act. The Act provides a statutory remedy to criminal defendants who assert claims for substantial violations of their constitutional rights at trial. *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act is not a substitute for an appeal but offers a mechanism for a criminal defendant to assert a collateral attack on a final judgment. *Id.* Therefore, where a petitioner has previously challenged a judgment of conviction on appeal, the judgment of the reviewing court will serve to bar postconviction review of all issues actually decided by the reviewing court as well as any other claims which could have been presented to the reviewing court. *Id.* Therefore, only one postconviction proceeding is contemplated under the Act. *People v. Robinson*, 2020 IL 123849, ¶ 42.

¶ 63    In noncapital cases, the Act creates a three-stage procedure for relief. *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). A defendant, at the first stage, need only present a limited amount of detail in the petition. *Id.* at 9. Since most petitions are drafted at this stage by *pro se* defendants, the threshold for survival is low and a defendant is only required to allege the "gist" of a constitutional claim. *Id.* If the circuit court independently determines that the petition is either "frivolous or is patently without merit," it dismisses the petition in a written order. 725 ILCS 5/122-2.1(a)(2) (West 2018); *Hodges*, 234 Ill. 2d at 10. If a petition is not summarily dismissed

by the circuit court during the first stage, it advances to the second stage where counsel may be appointed to represent an indigent defendant and where the State is allowed to file a motion to dismiss or an answer to the petition. *Hodges*, 234 Ill. 2d at 10-11.

¶ 64    To avoid dismissal at the second stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). At this stage of the proceedings, the circuit court takes all well-pleaded facts which are not positively rebutted by the trial record as true. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). "Nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act." *People v. Coleman*, 183 Ill. 2d 366, 381 (1998). If the circuit court denies the State's motion to dismiss, a third-stage evidentiary hearing must follow. *People v. English*, 403 Ill. App. 3d 121, 129 (2010); 725 ILCS 5/122-6 (West 2018).

¶ 65                              Standard of Review

¶ 66    In this case, the petition advanced to the second stage and was dismissed. Accordingly, our standard of review is *de novo*. *Pendleton*, 223 Ill. 2d at 473; *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 151. *De novo* consideration means that the reviewing court performs the same analysis a trial judge would perform. *Tyler*, 2015 IL App (1st) 123470, ¶ 151.

¶ 67                              *Brady* Violation

¶ 68    Defendant here maintains that he made a substantial showing of a constitutional violation where the State committed a discovery violation under *Brady* by failing to produce the .357-caliber revolver which was found outside of the apartment where the shooting occurred along with defendant's jacket and keys.

¶ 69    The State argues that even if the items were suppressed, they were not material and

therefore there was no due process violation. The State maintains that the evidence at trial made clear that defendant never acted in self-defense and that the victim was not in possession of a firearm on the day in question. The State further asserts that the existence of the .357-caliber revolver, jacket, and keys was always known to the jury and the physical production of these items would not have affected the verdict.

¶ 70     The United States Supreme Court established the State's affirmative duty to disclose evidence favorable to a defendant in *Brady*. *People v. Hobley*, 182 Ill. 2d 404, 432 (1998). In *Brady*, the United States Supreme Court held that "the prosecution must disclose evidence that is favorable to the accused and 'material either to guilt or to punishment.' " *People v. Harris*, 206 Ill. 2d 293, 311 (2002) (quoting *Brady*, 373 U.S. at 87). An alleged *Brady* violation is cognizable under the Post-Conviction Hearing Act. See *Hobley*, 182 Ill. 2d at 429. To succeed on a *Brady* claim, a defendant must demonstrate that "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either willfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008).

¶ 71     With these principles in mind, we turn to analyze the facts of this case in conjunction with the requirements set forth in *Brady*. Even presuming the evidence was suppressed and that it was favorable to defendant, we agree with the State that this evidence was not material to the verdict. In assessing materiality, we must keep in mind that evidence is "material" for the purposes of *Brady* if there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed. *Beaman*, 229 Ill. 2d at 74. The standard for materiality for the purposes of *Brady* is borrowed from the standard for prejudice under *Strickland v. Washington*, 466 U.S. 668, 694 (1984). *United States v. Bagley*, 473 U.S. 667, 682

(1985); see *People v. Morales*, 2019 IL App (1st) 160225, ¶ 36. Under each standard, a "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. To satisfy *Brady*, an accused must establish that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *Beaman*, 229 Ill. 2d at 74.

¶ 72    We find that the collectively suppressed evidence (the revolver, jacket, and keys) was not so material as to undermine the confidence in the verdict. See *People v. Snow*, 2012 IL App (4th) 110415, ¶ 37 (noting that a reviewing court considers the suppressed evidence collectively, not item-by-item). The jury was presented with testimony that these items were recovered as well as the location of where these items were found. As to defendant's jacket and keys, there is no question that these items were discovered in Hurd's apartment by the investigators. In addition, defendant testified that he left his jacket and keys in Hurd's apartment and returned to the apartment to obtain them. Thus, it was left to the jury to determine whether the items recovered from Hurd's apartment supported defendant's version of events.

¶ 73    The jury was also presented with evidence of the .357-caliber revolver in the form of testimony from Laserko and Sergeant Rafferty and a photograph of the weapon. In addition, the jury heard defendant's testimony that the firearm belonged to Jerome, and it was in Jerome's possession on the day Vance was killed. In contrast, the eyewitnesses (Conway, Reggie, and Fulwiley) testified that Vance was not in possession of any weapon when he was shot. The eyewitness testimony was corroborated by the crime scene photographs which depicted Vance lying face down on the floor with his hands underneath him as well as Laserko's testimony that Vance's body was not moved until after the photographs had been taken and Vance was not found to be in possession of a firearm. In total, the evidence regarding the .357-caliber

revolver—its condition, where it was discovered, who it belonged to—was presented to the jury. As all of this information was presented to the jury, we find that the fact the physical revolver was not presented to the jury did not undermine the verdict.

¶ 74    While defendant maintains that the weapon *could* be tested for Vance's fingerprints which, if present, would support his self-defense theory, he provides this court with no citation to authority which would allow us to make such a leap. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (requiring an appellant's brief "contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on"); *People v. Fredericks*, 2014 IL App (1st) 122122, ¶ 64 ("[I]t is well settled that *** bare contentions that fail to cite any authority do not merit consideration on appeal."). Indeed, we may not assume facts which are not supported by the record or the affidavits accompanying the petition. *Coleman*, 183 Ill. 2d at 381. In addition, nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act. *Id.* Defendant's allegations that Vance's fingerprints *could* be on the revolver amount to such conclusions in this instance and this court is not bound to take them as true when considering whether the dismissal of his petition was proper. See *id.*; *Pendleton*, 223 Ill. 2d at 473.

¶ 75    We further observe that this court already found that the evidence of defendant's guilt was overwhelming on direct appeal. Overall, the evidence that defendant acted in a premeditated manner continues to be overwhelming even in the absence of the suppressed evidence. See *People v. Miller*, 203 Ill. 2d 433, 440 (2002). Defendant, who testified he was not fearful of Vance's initial threats of physical violence and resolved their recent altercation with a handshake, left the apartment only to return 15 minutes later with his automatic weapon primed for firing. Eyewitnesses observed him enter the apartment and immediately shoot Vance in the

head. Defendant's testimony did not contradict this fact as he acknowledged that he did not give Vance a chance to raise his weapon—"With all due respect, I didn't give him a chance to." Moreover, each of the eyewitnesses testified that Vance was not in possession of a weapon at that time but was, in fact, talking on the telephone and no weapon was recovered from Vance's body or in its vicinity. Indeed, Vance fell forward onto the floor and the photographs of Vance's body demonstrate that his hands were positioned underneath his body with his left hand still holding the telephone receiver.

¶ 76    In addition, the trial court instructed the jury on self-defense and second-degree murder based on an unreasonable belief in self-defense and therefore the jury was aware of defendant's theory of the case and how the revolver, jacket, and keys related to his version of events. Defense counsel also thoroughly cross-examined each of the eyewitnesses and was able to elicit that they were all members of the same gang as Vance. And while these eyewitnesses testified that they were long-time friends of Vance, they also testified they did not know defendant as well. Accordingly, defendant was able to establish that the eyewitnesses harbored a loyalty to Vance over defendant and trial counsel argued as much during closing argument. The exclusion of the revolver, jacket, and keys thus did not serve to undermine the verdict where the jury was presented with uncontradicted evidence that these items existed. In fact, these items were thoroughly discussed through witness testimony, physical evidence, and trial counsel's cross-examination and argument. Accordingly, we find that the circuit court properly dismissed defendant's petition for failure to make a substantial showing of a constitutional violation. See *People v. Harris*, 2013 IL App (1st) 111351, ¶¶ 53-56 (finding in light of the strength of the State's evidence the undisclosed evidence was not material); *People v. Jarrett*, 399 Ill. App. 3d 715, 728 (2010) (finding the undisclosed evidence was not material where the evidence

demonstrated the defendant and his codefendant were the initial aggressors and did not act in self-defense).

¶ 77    In reaching this conclusion we have considered *People v. Nichols*, 63 Ill. 2d 443 (1976), and *People v. Wisniewski*, 8 Ill. App. 3d 768, 769 (1972), two cases defendant relies upon to support his argument that the missing physical evidence was material to his defense.  In *Nichols*, our supreme court considered whether the withholding of a shoe that was discovered outside the crime scene by the State constituted a *Brady* violation.  There, the defendants were convicted of burglary, armed robbery, and attempted rape based on the victims' identification from photographs of the defendants.  *Nichols*, 63 Ill. 2d at 444.  At trial, the State failed to produce a shoe which was left below the window used by the perpetrators to enter the victims' apartment, and instead only disclosed a copy of a crime laboratory report prepared following an examination of the shoe.  *Id.* at 445-46.  Our supreme court held the failure to disclose the shoe was a discovery violation pursuant to Rule 412(c) and *Brady*.  *Id.* at 448.  The shoe in *Nichols* was material as it was left behind under the apartment window by the perpetrators, and there was a palm print near the same window which did not match any of the defendants.  *Id.*  The shoe, therefore, could have led to a different verdict at trial.  *Id.*  Moreover, our supreme court observed that the defendants denied committing the offenses and presented alibi defenses.  *Id.*  The defendants sought to demonstrate that the victims had been mistaken in their identification of them and that other persons committed the offenses.  *Id.*  Thus, the shoe, in conjunction with the identifiable palm print on the windowsill, which was not one of the defendants' or victims', was material evidence.  *Id.*

¶ 78    Here, defendant maintains that the .357-caliber revolver is similarly material evidence which could have affected the verdict as it supports his theory of self-defense.  The physical

evidence in this case, however, differs from the shoe in *Nichols*. In *Nichols*, the shoe was discovered near a palm print which did not belong to any of the defendants. *Id.* Therefore, when viewed together with the palm print, the shoe was material as it pointed to an intruder other than the named defendants. *Id.* Here, however, there was no additional evidence pointing to a shooter other than defendant. In addition, whereas the existence of the shoe was completely hidden from the *Nichols* jury—the jury in the present case was provided with testimony from various sources regarding the revolver, jacket, and keys, and was also presented with a photograph of the revolver. Thus, while the *Nichols* court found the shoe undermined confidence in the verdict, we cannot say the same is true in this case.

¶ 79    In *Wisniewski*, the court reversed and remanded for a new trial where the State's failure to disclose the existence of a piece of pipe found at the scene constituted a *Brady* violation. In that case, the defendant was charged with the murder of his roommate. *Wisniewski*, 8 Ill. App. 3d at 769. During the trial, the defendant asserted that he shot his roommate in self-defense after his roommate—while inebriated—moved to attack him with a length of pipe. *Id.* at 770. The physical pipe, however, was not admitted as evidence during the trial and, in fact, the State emphasized the lack of physical evidence in its closing argument when it stated, "The pipe that has been talked about repeatedly by the defense counsel, I submit I don't know where it is. The police officers were thorough in their investigation. Forty-four exhibits in this case and there is no pipe." (Internal quotation marks omitted.) *Id.* The jury found the defendant guilty of voluntary manslaughter. *Id.* at 769.

¶ 80    After the trial but before the defendant was sentenced, the defendant's attorney and a police officer who participated in the investigation of the offense had a discussion of the case at a social event. *Id.* at 770. During that discussion, the police officer referred to a piece of pipe that

was discovered underneath a pile of rags in a hallway adjacent to the room where the shooting occurred. *Id.* The disclosure resulted in the defendant filing a motion for a new trial based upon newly discovered evidence. *Id.* At the hearing, it was established that the piece of pipe was discovered by investigators and submitted to the State crime laboratory for testing but was not listed in the inventory of items examined by this laboratory. *Id.* Despite finding that the pipe was "a missing link in the chain of events," the trial court denied the defendant's motion for a new trial. *Id.* at 771. The appellate court reversed, finding that the State's failure to produce the pipe at trial "would place a serious strain upon the credibility of defendant's story" and that this error was compounded by the prosecutor's emphasis of the lack of credibility of the story by pointing to the absence of the pipe. *Id.* The reviewing court ultimately found that the lack of disclosure of the pipe caused defendant prejudice, particularly considering his theory of self-defense. *Id.*

¶ 81    Aside from the fact that the *Wisniewski* court did not discuss the absence of the pipe under the *Brady* framework, the facts of that case are inapposite to the facts of the case at bar. While in *Wisniewski* the pipe was material to the defendant's self-defense theory, here the actual .357-caliber revolver is not similarly material. At defendant's trial, the .357-caliber revolver was discussed during the State's case-in-chief as Laserko testified to its discovery and the fact it was inventoried by the police. ASA Delahantey also testified regarding defendant's statements to her about the weapon. Then, when defendant testified, a photograph of the weapon was admitted into evidence and published to the jury. Unlike the facts of *Wisniewski*, at no point was it a matter of credibility as to whether or not the .357-caliber revolver existed. It did exist; the question was only whether, at the time of the shooting, it was in the hands of the victim or outside the apartment building in the bushes. Also, unlike *Wisniewski*, there were multiple

eyewitnesses to Vance's murder, all who testified that Vance was not in possession of the weapon at the time of the offense. Accordingly, we find *Wisniewski* to be inapplicable regarding this case.

¶ 82    In sum, we find the circuit court properly dismissed defendant's postconviction petition at the second stage of proceedings as the suppressed evidence was not material, particularly in light of the overwhelming evidence of defendant's guilt. See *Miller*, 203 Ill. 2d at 440.

¶ 83                                Ineffective Assistance of Counsel

¶ 84    Defendant also asserts that he made a substantial showing of a constitutional violation that his trial counsel was ineffective for failing to move for sanctions under the Illinois discovery rules and that appellate counsel was ineffective for failing to raise this claim on direct appeal.

¶ 85    In response, the State maintains that defendant cannot meet his burden where the .357-caliber revolver, jacket, and keys were not material to his guilt and therefore he cannot demonstrate the requisite prejudice under *Strickland*.

¶ 86    We agree with the State. Defendant fails to make a substantial showing of a constitutional violation of ineffective assistance of trial and appellate counsel. Ineffective assistance of appellate counsel is determined under the same standard as a claim of ineffective assistance of trial counsel. See *People v. Rogers*, 197 Ill. 2d 216, 223 (2001); *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). Accordingly, a defendant who claims that appellate counsel was ineffective for failing to raise an issue on appeal must allege facts demonstrating such failure: (1) was objectively unreasonable and (2) that counsel's decision not to pursue an issue on appeal prejudiced defendant. *Rogers*, 197 Ill. 2d at 223. Appellate counsel is not required to raise every conceivable issue on appeal, and it is not incompetence for counsel to refrain from raising issues that counsel believes are without merit, unless counsel's appraisal of

the merits is patently wrong. *People v. Simms*, 192 Ill. 2d 348, 362 (2000). Accordingly, the inquiry as to prejudice requires that the reviewing court examine the merits of the underlying issue. *Id.* Unless the underlying issue has merit, there is no prejudice from appellate counsel's failure to raise it on appeal. *Edwards*, 195 Ill. 2d at 164; see also *Simms*, 192 Ill. 2d at 362 ("for a defendant does not suffer prejudice from appellate counsel's failure to raise a nonmeritorious claim on appeal").

¶ 87    As detailed above, the determination of whether the lost evidence was material under a *Brady* analysis is identical to the prejudice prong of *Strickland*. See *Harris*, 206 Ill. 2d at 311 (materiality under *Brady* identical to prejudice under *Strickland*); *People v. Carballido*, 2015 IL App (2d) 140760, ¶ 66 (same). As we have already determined that defendant suffered no prejudice as these items were not material to his guilt, defendant similarly cannot demonstrate prejudice under *Strickland*. See *Carballido*, 2015 IL App (2d) 140760, ¶ 66. Thus, his ineffective assistance counsel claims—which are the basis of this discovery issue—fail. See *Miller*, 203 Ill. 2d at 440.

¶ 88    In conclusion, we affirm the judgment of the circuit court dismissing defendant's postconviction petition at the second stage of proceedings under the Act.

¶ 89                                    CONCLUSION

¶ 90    For the reasons stated above, we affirm the judgment of the circuit court.

¶ 91    Affirmed.